IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

LAVARIA GLENN,

          Plaintiff,

v.                                           Case No.  22-2121-JWB

P1 GROUP, INC.,

          Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion for summary judgment.  (Doc. 37.) The motion has been fully briefed and is ripe for decision.  (Docs. 39, 42, 45.)  The motion is GRANTED IN PART and DENIED IN PART for the reasons stated herein.

## I.    Facts

Plaintiff Lavaria Glenn was employed by Defendant P1Group as a zone technician from February 28, 2021, until his termination on March 15, 2021.  During his employment, Plaintiff was on probationary status and worked for Defendant at the University of Kansas Health System Hospital ("KU Health System").  As a zone technician, Plaintiff was responsible for performing maintenance and repair work on plumbing, electrical, heating, air conditioning and refrigeration facilities and equipment.  Plaintiff was required to read and write so that he could assess written directions on maintaining and repairing systems and equipment.  Further, he was required to log all the calls that he received and document all actions taken.  (Docs. 39 at 2–3; 42 at 2–3.)

After Plaintiff's interview and a review of his resume, Defendant believed Plaintiff had the requisite qualifications to perform the job and would not need substantial training.  Plaintiff's resume stated that he had previous experience as a maintenance technician, machine operator, and

construction laborer.  Upon hiring, Plaintiff completed the necessary onboarding paperwork in which he indicated that he did not have a disability or a need for an accommodation.  Plaintiff began work on the first shift and he initially shadowed Melissa Bolles, who was a first shift lead but not a supervisor.  John Sherman was the supervisor for the first shift when Plaintiff began his employment.  Sherman reported to Charlotte Payne, a Sodexo employee.  Sodexo is another contractor for KU Health System.  (Docs. 39 at 4; 42 at 3.)

According to Bolles, she had to assist Plaintiff with filling out the paperwork to document the work he had performed with her on the last day he shadowed her.  (Doc. 39-10, Bolles' Depo. at 24:9–15.)  In early March, Bolles told Sherman that she believed that Plaintiff was illiterate. (Doc. 39-2 at 3.)  On or about March 4, 2021, which was Plaintiff's third day of working, Bolles made three comments to Plaintiff that were offensive to him.  Those comments were as follows: 1) "Well, if you ever get into any trouble here, just don't say this wouldn't have happened to me if I were white;" 2) "Well, if you're a Democrat, you're going to have trouble working here;" and 3) Bolles said people call her a bitch and told Plaintiff that another employee doesn't like women but Plaintiff won't have a problem with him because Plaintiff is a man.  (Doc. 39-1, Plaintiff's Depo. at 75:13–19, 77:16–22; 39-6, Payne's Depo. at 48:8–16; 39-11.)  On March 4, Plaintiff reported these statements to Mercedes Jackson, Defendant's human resources coordinator, and Richard Pember, facilities director who was employed by Sodexo.  Jackson immediately emailed Tony Groce, Defendant's human resources manager about the complaint.  Payne started investigating Plaintiff's complaint the same day.  (Docs. 39 at 5; 42 at 3.)

Payne spoke with Plaintiff regarding the comments and learned that Sonny Volavongsa, another employee and a person of color, was present when the comments were made.  Plaintiff also told Payne that Shane Bolles, Melissa Bolles' husband (referred to as "Shane"), was present

when Bolles made the comments.  Payne interviewed Bolles and Volavongsa.  Bolles admitted that she made the political statement and the statement about another employee not liking women. (Docs. 39 at 6; 42 at 4.)  Bolles denied making any statement regarding race.  When Payne questioned Volavongsa regarding the race comment, he said that he did not hear Bolles make the statement but also indicated that he might have just tuned her out.  (Doc. 39-6, Payne Depo. at 121:24–122:5.)  Payne testified that she would have been a little surprised if her investigation concluded that Bolles made the race-based statement.  Payne did not interview Shane because she believed that he would be biased.  Payne testified that she thought Groce would interview Shane and have a better questioning technique.  (*Id.* at 41:18–42:3.)  No one interviewed Shane during the investigation.  Ultimately, Payne determined that she could not conclude whether Bolles made any race-based statements to Plaintiff.  On March 5, Groce spoke with Payne, reviewed the information, and agreed that Plaintiff's complaint regarding the race-based statement could not be substantiated.  (Docs. 39 at 7; 42 at 4–5.)  Bolles was never disciplined for her conduct related to Plaintiff's complaint.  Defendant's position is that Bolles was not disciplined because it could not corroborate Plaintiff's complaint that Bolles made a race-based statement.  (Docs. 39 at 16; 42 at 10.)

Plaintiff requested a transfer to second shift and, on March 7, Plaintiff began working the second shift and reported to Luis Tello.  Because there are fewer zone technicians on second shift, the employees must be able to work independently.  On March 7, Tello observed Plaintiff clock in and immediately sit down to talk to co-workers which Tello found to be disrespectful.  When Tello worked with Plaintiff later that evening, he did not believe that Plaintiff was an experienced maintenance technician due to the difficulties Plaintiff had with changing a light bulb in a light fixture.  (Doc. 39-7, Tello Depo. at 33:12–24.)  Plaintiff testified that the light fixture fell apart

when he first inspected it and that even Tello had difficulty determining how to repair the fixture. (Plaintiff Depo. at 103:8–104:22.)   Tello admitted during his testimony that he had to inspect another fixture to "make sure that" he was doing it right.  (Tello Depo. at 34:12–15.)

On March 8, Plaintiff was to complete an online orientation for KU Heath System on the premises.  A few days earlier, Plaintiff received an email informing him to arrive for orientation at 8:00 a.m.  (Doc. 42-9.)  Plaintiff was confused as to whether he should attend at 8:00 a.m. or at the start of his new shift, 3:00 p.m.  Plaintiff contacted Jackson for clarification but she was not able to help him.  Plaintiff also texted Sherman to ask him when he should arrive for orientation but Sherman did not respond to Plaintiff's text before 8:00 a.m. on March 8.  Plaintiff decided to go to orientation at 8:00 a.m. as instructed in the email.  (Docs. 42-7; 42 at 14; 45 at 4.)

On March 8, Plaintiff made two statements while working that were race-based.  Those statements included that Plaintiff's neighbor is Mexican and married to a white woman and that black men have been used in medical experiments in the past.  (Docs. 39 at 9; 42 at 7.)  Tello testified that these statements were inappropriate conversation in the workplace.  That same day, Tello emailed Sherman regarding Plaintiff's orientation and the statement Plaintiff allegedly made about medical experiments involving black men.  (Doc. 39-12.)  At the time he sent the email, Tello did not know about Plaintiff's complaint regarding Bolles' statements; however, Plaintiff did tell Tello that the reason he wanted to move to second shift was because of Bolles had made "offensive" comments to Plaintiff.  (Tello Depo. at 61:3–25.)  After sending the email, Tello spoke with Sherman about Plaintiff.  In that conversation, Tello told Sherman that he did not want Plaintiff on second shift because he had concerns with his performance.  (*Id.* at 58:3–19; Doc. 39-2 at 3.)  On March 9, Payne emailed Groce to inform him that she, Sherman, and Tello wanted to terminate Plaintiff's employment.  In that email, Payne stated that "no one knows why he showed

4

up at 8, after being told to do orientation at 3:00," Plaintiff was upset about having to come in later that day and did not have much sleep, and that Tello said Plaintiff "didn't want to do very much Sunday night." (Doc. 39-12.) Tello testified that he does not remember making that statement and based on his observation, he would not describe Plaintiff as "not wanting to do much work." (Tello Depo. at 36:25–37:6.)

At some point during Plaintiff's employment, Payne instructed Tello to warn his team not to talk about race or politics with Plaintiff. (Tello Depo. at 45:23–46:17.) Payne told Tello that Plaintiff had complained about racism in a previous position and his supervisor was terminated as a result. (*Id.* at 63:6–10.)

Later on March 9, Payne, Groce, Sherman, and Pember had a conference call to discuss Plaintiff's employment. During the call, they discussed Plaintiff's performance. Sherman stated that he observed Plaintiff sitting on the docks when he should have been working and that he had disappeared for extended periods of time. (Doc. 39-2 at 2.) Defendant asserts that they also discussed their belief that Plaintiff was unable to read and write during this conference call. Plaintiff asserts this statement is controverted and that they made the decision to terminate prior to being aware of any literacy issues. (Doc. 42 at 8.) Based on a review of the evidence, the court finds this statement is controverted. Defendant's citations to the evidence do not establish that this was discussed during that conference call and the cited testimony of Groce supports Plaintiff's assertion. (Doc. 39-5, Groce Depo. at 51:8–52:1 (discussing that performance issues were the concerns for termination); Doc. 39-2 (Sherman's declaration states that he knew about the literacy concerns but his declaration does not reflect that those concerns were discussed during that call); Payne Depo. at 97:3–8 (discussing the reasons they decided to terminate included that Plaintiff wasn't a good fit and Tello stated that he didn't want to work.)) The individuals involved in the

decision to terminate did not have knowledge of Plaintiff's dyslexia or any other disabling condition at the time of the decision.  (Docs. 39 at 11; 42 at 8.)  After the call, Groce discussed the performance deficiencies and termination decision with Shana Wallace, Defendant's human resources director.

On March 15, Plaintiff's employment was terminated during a meeting.  Those in attendance included Plaintiff, Groce, Payne, and Tello.  Groce informed Plaintiff that he was being terminated because he was not a good fit.  Notably, the meeting began with Groce telling Plaintiff that Groce was aware of the complaint that Plaintiff made about Bolles' comments.  (Doc. 39-13.) Then, Groce told Plaintiff that he was also aware that Plaintiff made some comments that others believed were inappropriate.  Groce went on to state that he couldn't find "anybody to validate the things that you allegedly – or that you allege that Melissa had shared with you, and then some of the things that I was told the things that you said on second shift that kind of made people feel a little uncomfortable and that were inappropriate."  (*Id.* at 2.)  Groce told Plaintiff that he was not "a good fit" and was being let go.  (*Id.*)  Plaintiff tried to discuss Bolles' statements, his move from first to second shift as a result, and how he took the appropriate steps by reporting her statements to human resources.  (*Id.* at 3.)  Groce stated that Plaintiff didn't do anything wrong to which Plaintiff responded that he was unemployed and Bolles has a job.  (*Id.*)  Groce then said, "we're going to end this.  You haven't been with this company long enough to know how the hell we do things, okay.  I did what was appropriate by doing what I was supposed to do by, you know, they're the customer, this is the customer, we're a contractor."  (*Id.*)   At no point did Groce tell Plaintiff that Defendant had concerns with his performance.  Rather, Groce told Plaintiff that he would help Plaintiff find a job in maintenance in the city.  (*Id.*)  Plaintiff then said that all he did was follow the policy and talk to human resources.  In response, Groce said that he was not saying Plaintiff

did anything wrong but just that he's not a good fit.  Groce also told Plaintiff that it didn't really matter whether Plaintiff made those inappropriate statements or not because they already decided to terminate him last week.  (*Id.* at 2.)  At the end of the meeting, Groce had KU security come and escort Plaintiff off the campus.  Defendant asserts that it is company policy to have terminated employees escorted off campus; Plaintiff disputes this statement.  Plaintiff had to carry his tools out in garbage bags after his termination.  (Docs. 42 at 18; 45 at 4.)

Groce completed Plaintiff's separation form which stated that Plaintiff was terminated because he was "not a good fit."  (Doc. 42-6 at 3.)  Notably, the form included the following reasons for discharge: attendance; failure to satisfactorily perform job duties; improper conduct; violation of company policy; violation of safety rules; drug/alcohol related; and other.  Groce checked the box marked "other" and put "not a good fit."  (*Id.*)  Groce then added the following remark: "It has been determined that Lavaria is not a good fit for P1 Group and The University of Kansas Health System."  (*Id.*)  The form further indicated that he was not eligible for rehire.  (*Id.*)

On March 18, 2021, Plaintiff emailed Defendant seeking reinstatement and asking Defendant to review the investigation into his complaint regarding Bolles' statements and his termination.  Wallace asked Groce to gather documentation and information from the individuals involved in the March 4, 2021, complaint investigation and to also gather information regarding Plaintiff's termination.  On March 19, Jackson told Groce that Plaintiff would FaceTime his wife while working and it appeared that she was helping him complete paperwork.  (Docs. 39 at 16; 42 at 10.)  On March 22, Payne provided a written statement summarizing her interviews and confirming her prior oral statement regarding Plaintiff's complaint.  Payne stated that Bolles said Plaintiff needed help filling out his paperwork and that he needed help with orientation.  (Doc. 39-15 at 1.)  On an unknown date between March 4 and March 22, Bolles told Payne that Plaintiff

could not read very well and that he wanted to do orientation from home. (*Id.* at 3.) On April 14, Tello provided Groce with an email that stated he observed Plaintiff having someone else do Plaintiff's paperwork. (*Id.* at 6.) During his deposition, Tello testified that the only time he observed someone helping Plaintiff was when Plaintiff was in training and all new employees are coached on how to complete the paperwork in the computer. (Tello Depo. at 39:5–17.) On March 23, Groce provided information to Wallace who ultimately agreed that Plaintiff's complaint against Bolles could not be substantiated. Wallace also determined that the termination was justified because of Plaintiff's performance and inability to read and write. (Docs. 39 at 16–17; 42 at 10–11.) Wallace did not speak with Payne or any witnesses in conducting her investigation. (Wallace Depo. at 78:2–14.) On that same day, Wallace informed Plaintiff of her decision and that he would not be reinstated.

In April 2021, Mike Gossman, Defendant's executive president, learned that Plaintiff wanted his job back, was contacting his union representative, threatening to file suit and picket KU Medical Center. Gossman spoke with Wallace to see if Plaintiff could be reinstated. (Doc. 39-17.) Wallace told Gossman that Plaintiff's supervisors were concerned that Plaintiff could not read or write. They decided to offer Plaintiff his position back if he could pass a reading and writing literacy skills test but the format of the test had not been determined. At that time, Gossman did not know whether Plaintiff was dyslexic or had another disabling condition. (*Id.*)[1]

On May 17, Wallace called Plaintiff to inform him that he could have his job back if he could "take and pass a skills test that demonstrates reading and writing skills." (Doc. 42-15 at 2.) Wallace, however, informed Plaintiff that she was unable to tell Plaintiff exactly what the test

---

[1] Although Defendant asserts that Wallace did not know of Plaintiff's dyslexia at that time, the cited deposition statements do not support this assertion. However, Plaintiff has not put forth evidence that Wallace knew about his dyslexia prior to the phone call.

would be like.  (*Id.* at 5.)  Plaintiff told Wallace that he struggled with dyslexia and Wallace responded that she had dyslexia and many other employees have learning disabilities but that he needed to demonstrate that he could read and write because it is a job requirement.  During the call, Plaintiff also told Wallace that he had informed Jackson about his dyslexia during his onboarding.  Plaintiff then asked if he could use a cell phone but Wallace said that he could not use a phone.  (*Id.* at 5.)  Plaintiff asked if he could have an accommodation and that he would like the opportunity to use something during the test because he has the aid of a tablet when he is working.  (*Id.*)  Wallace told Plaintiff that she would get back to him.  Wallace believed that Plaintiff had requested a reasonable accommodation in the form of an assistive device to take the test.

On May 20, Wallace e-mailed Plaintiff paperwork to begin the interactive process.  Wallace also called Plaintiff to tell him about the paperwork.  Plaintiff never responded to Defendant's request for information related about his need for an accommodation.  Defendant would have reinstated Plaintiff to his position if he had taken and passed the test.  Plaintiff did not think it was a real offer of employment because Wallace was vague about the conditions of the test.  (Plaintiff Depo. at 194:9–18.)  Plaintiff felt humiliated by the offer of the literacy test and did not complete the reasonable accommodation paperwork.  Plaintiff thought Defendant was making fun of him.  (Doc. 42-7.)

In its verified interrogatory responses, Defendant stated that Plaintiff was terminated due to "concerns about Plaintiff's work schedule, Plaintiff's paperwork, Plaintiff's disinterest in work, failure to arrive at the appropriate time for orientation, and getting assistance with paperwork."  (Doc. 42-16 at 6.)  Defendant reiterated that Plaintiff was not a good fit.  (*Id.*)  The concerns about Plaintiff's work schedule and the orientation issue both involved his failure to arrive at the

appropriate time for orientation.  Further, Plaintiff's "paperwork" and "getting assistance with paperwork" involved the same concern about having someone assist him with paperwork. (Wallace Depo. at 106:17–25.)

After the close of discovery, Defendant submitted amended interrogatory responses which included additional performance based reasons for Plaintiff's termination and the alleged inappropriate comments by Plaintiff.  (Doc. 42-18 at 3.)

Plaintiff filed a complaint against Defendant alleging claims of race and color discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e and 42 U.S.C. § 1981.  Plaintiff also asserted a claim of disability discrimination under the Americans with Disability Act ("ADA"), 42 U.S.C. § 12112(a).  Defendant now moves for summary judgment on all claims.

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphases in original).  "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).  Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The court views the evidence and all

reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

## III. Analysis

### A. Race and Color Discrimination

Plaintiff has alleged that Defendant discriminated against him on the basis of his race and color in violation of Title VII and § 1981. Regardless of whether Plaintiff's claims are brought pursuant to Title VII or § 1981, "the elements of a discrimination lawsuit are the same." *Gerovic v. City & Cnty. of Denver*, No. 22-1148, 2023 WL 2293518, at *7 (10th Cir. Mar. 1, 2023) (quoting *Fulcher v. City of Wichita*, 387 F. App'x 861, 864 (10th Cir. 2010)). Therefore, the court will address these claims together.

Because Plaintiff does not have direct evidence of discrimination, his claims are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Under that framework, Plaintiff has the initial burden to establish a prima facie case of discrimination. *Id.* To demonstrate a prima facie case of discrimination based on race or color, Plaintiff must establish that (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *Id.* (citing *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)).

The burden then shifts to Defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If Defendant meets this burden, Plaintiff must come forward with evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id.* (citing *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011)).

Because the parties do not dispute that Plaintiff has stated a prima facie case of race and color discrimination, the court turns to whether Defendant has met its burden to articulate a legitimate, nondiscriminatory reason for terminating Plaintiff's employment.  This "burden is one of production, not persuasion; it can involve no credibility assessment."  *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142).  This burden is "exceedingly light," and Defendant has met it here.  *Id.*  According to Defendant, it terminated Plaintiff's employment based on its belief that Plaintiff lacked skills of an experienced maintenance person, Plaintiff was disrespectful and disinterested in working, and Plaintiff made disrespectful statements.  (Doc. 39 at 22–24.) Defendant asserts that based on Tello's observations regarding Plaintiff's skills and experience, Sherman agreed that Plaintiff was not a good fit.  All of the decisionmakers agreed to terminate Plaintiff's employment.  Defendant's proffered reason is sufficient to meet its light burden.

The burden of proof now shifts back to Plaintiff to show that the proffered reason is pretextual.  Evidence of pretext includes evidence tending to show "that the defendant's stated reason for the adverse employment action was false."  *Carter,* 662 F.3d at 1150.  It also includes evidence that Defendant has "shifted rationales" or treated similarly situated employees differently.  *Crowe v. ADT Servs., Inc*., 649 F.3d 1189, 1197 (10th Cir. 2011).  Plaintiff can also establish pretext by showing that the "employer's proffered non-discriminatory reasons [were] either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  *Plotke v. White*, 405 F.3d 1092, 1102–03 (10th Cir. 2005) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  In essence, Plaintiff can demonstrate pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could

find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc.*, 737 F.3d 642, 655 (10th Cir. 2013). "[I]n this Circuit ... an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221 (10th Cir. 2015) (quoting *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha, J., concurring in part)).

After a review of the evidence viewed in the light most favorable to Plaintiff, the court finds that the evidence is sufficient to cast doubt on Defendant's proffered reasons. Turning to the proffered reasons, Defendant first argues that Plaintiff's lack of experience was one of the reasons for his termination. In support of this position, the only alleged deficient performance discussed in the record was Plaintiff's alleged difficulty replacing a light bulb. According to Defendant, the only work necessary for the task was to replace a light bulb, which is an admittedly simple task, and which Defendant claims Plaintiff could not perform. Defendant argues that Plaintiff cannot show pretext by his subjective belief in his performance and that Defendant honestly believed that he was unable to perform the work. (Doc. 39 at 26.) While the court agrees that it is not to second guess Defendant's business judgement and the court cannot find pretext based on an employee's subjective evaluation of his performance, the court is to look at the facts as they appear to the person making the decision in determining whether Plaintiff has established pretext. *See Kendrick v. Penske Transp. Servs., Inc*., 220 F.3d 1220, 1231 (10th Cir. 2000).

Plaintiff has introduced evidence that the light fixture was broken when he went to inspect it and that the light fixture fell apart and that even Tello had difficulty determining how to repair the fixture. (Plaintiff Depo. at 103:8–104:22.) Tello's testimony lends support to Plaintiff's testimony that Tello also had problems with the fixture. Plaintiff further testified that this assignment was the only issue in completing a task that he had while in his position. And Plaintiff

testified that he was never told by a supervisor that he was not doing the work he needed to do or that the quality of his work was deficient during the two weeks he was employed. (Plaintiff Depo. at 106:16–107:18.) Tello was Plaintiff's supervisor and involved in the decision to terminate Plaintiff.

Moreover, although Groce told Plaintiff that he was not a "good fit" during his termination meeting, Groce did not state that Plaintiff was not qualified for the position. Plaintiff argues that this supports pretext because Defendant's reason for termination has shifted. Defendant asserts that it is merely giving complete reasons for Plaintiff's termination in litigation and that the lack of experience is one example as to why Plaintiff was not a "good fit." In support, Defendant cites to *Bird v. W. Valley City*, 832 F.3d 1188, 1201 (10th Cir. 2016). (Doc. 39 at 26.) In *Bird*, the plaintiff was terminated for insubordination and failure to be cooperative with other employees. The plaintiff argued that this reason was different than the one outlined at termination. The Tenth Circuit discussed that if it was different, plaintiff's claim would survive summary judgment. Based on the evidence, however, it was not different. Rather, the defendant consistently stated that the plaintiff was terminated for insubordination and failure to cooperate. The defendant provided specific examples of that insubordination during litigation and some of those examples were included in a letter to the plaintiff prior to her termination. *Bird*, 832 F.3d at 1202. The facts in *Bird* do not support Defendant's position here. Defendant argues that its reasons for termination are simply examples of how Plaintiff is not a "good fit." While a lack of experience could mean that someone is not a "good fit" with that position, the term "good fit" is not synonymous with lack of experience nor does Defendant cite to any authority to explain that this term has a unified meaning with respect to terminations. Rather, it is vague, and without explanation, would leave an employee to wonder why he was being terminated which is exactly what occurred here and is

clearly reflected in the termination transcript.  Further, unlike *Bird*, the evidence surrounding the events leading up to the termination do not support a finding that lack of qualifications was the reason for the termination.

The evidence on the record shows that Plaintiff was never informed that Defendant thought he lacked qualifications for the position.  Significantly, the termination form completed at Plaintiff's separation only stated that Plaintiff was not a "good fit," although there was an option on the form to select "failure to satisfactorily perform job duties."  (Doc. 42-6 at 3.)  Had performance issues been one of the primary justifications for termination, a reasonable jury could conclude that Defendant should have checked the box to indicate as much.  Further, the email exchanges leading up to the termination do not indicate that Plaintiff was not qualified to perform the position.  (Doc. 39-12.)  Rather, as shown by Plaintiff, performance issues relied on by Defendant were not documented until after Plaintiff's termination and Tello testified that he was not asked to document any issues with Plaintiff's performance until April 14.  (*See* Docs. 39-15; 42 at 15; 45 at 4.)  Moreover, Groce offered to help Plaintiff find a new position in maintenance even though, if Defendant's proffered reason is believed, Defendant thought that Plaintiff could not even change a light bulb.

Based on this evidence, a jury could determine that his alleged lack of qualifications was a post hoc justification for his termination.  *See Bird,* 832 F.3d at 1201; *Tyler v. RE/MAX Mountain States, Inc*., 232 F.3d 808, 813 (10th Cir. 2000) ("We are disquieted, however, by an employer who 'fully' articulates its reasons for the first time months after the decision was made.").

The court finds that Plaintiff has put forth sufficient evidence from which a jury could conclude that this stated reason is not consistent with the evidence, contradicted by the evidence in the record, and a post hoc justification.[2]

Next, Defendant asserts that Plaintiff was not interested in working and disrespectful. Defendant contends that Plaintiff failed to follow instructions to report for training at 3 p.m. and instead reported for training at 8:00 a.m.  Notably, Defendant failed to set forth evidence that Plaintiff was instructed to report for training at 3 p.m.  Rather, the only fact related to the time of orientation includes an assertion that Sherman, Payne, and Tello believed that Plaintiff did not arrive on time for orientation.  (Doc. 39 at 8.)  Plaintiff, however, has introduced evidence that KU Health System sent him an email instructing him to go to orientation at 8 a.m.  Notably, the orientation was for KU Health System.  (*See id.*) (Defendant refers to the orientation as "KU Health System's online orientation.")  Plaintiff contacted both Sherman and Jackson for clarification on the time to report for orientation.  Jackson could not assist Plaintiff and Sherman did not respond to Plaintiff's text before 8:00 a.m. on March 8.  As a result, Plaintiff followed the instructions in the email and completed KU's orientation at 8:00 a.m.  (Docs. 42-7; 42 at 14; 45 at 4.)  Plaintiff completed the orientation and Payne testified that she would have reported at 8:00 a.m. if she would have been in Plaintiff's position.  (Payne Depo. at 67:20–68:13.)  Given this evidence and Sherman's knowledge of the situation but failure to respond to Plaintiff's text, the court finds that Plaintiff has identified implausiblities and weaknesses in this stated reason for Plaintiff's termination.

---

[2] Although Defendant does not discuss Plaintiff's alleged difficulties with reading and writing in its initial reason for termination, Defendant does raise that issue in its reply brief.  (Doc. 39 at 22–25; 45 at 7.)  The facts viewed in a light most favorable to Plaintiff, however, show that this issue was not discussed by the decisionmakers as a basis for his termination.

Next, Defendant argues that Plaintiff's employment was terminated because he made inappropriate race-based statements at work. (Doc. 39 at 23.)  In his termination meeting, however, Groce told Plaintiff that it didn't even matter if he made those statements because they had already decided to terminate his employment.   (Doc. 39-13 at 2.)   Moreover, this alleged basis for termination was not raised in Defendant's initial responses to interrogatories.  (Doc. 42-16 at 6.) Rather, it was not raised until Defendant amended its interrogatory answers.  (Doc. 42-18.)  Based on this conflicting evidence, a jury could find that this justification is pretext for discrimination.

With respect to Defendant's assertion that Plaintiff was disinterested in work, Defendant points to Tello's statement that Plaintiff sat down when he first arrived to work on one occasion to talk to co-workers and Sherman's statement that Plaintiff would sit on the docks and disappear. Plaintiff has testified that he never took any unauthorized breaks nor did he disappear during shifts. He further testified that he was never spoken to or counseled about taking unauthorized breaks or disappearing.  (Plaintiff Depo. at 105:23–106:16.)  Plaintiff also points to testimony by Tello that based on his observation, he would not describe Plaintiff as "not wanting to do much work."  (Tello Depo. at 36:25–37:6.)   The court finds that Plaintiff has put forth evidence of weaknesses in Defendant's stated reason that Plaintiff was disinterested in working.

Here, Plaintiff has cast substantial doubt on many reasons set forth by Defendant.  In such a case, a "jury could reasonably find the employer lacks credibility [and] [u]nder those circumstances, the jury need not believe the employer's remaining reasons." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1126–27 (10th Cir. 2005).  In *Bryant*, the Tenth Circuit held that summary judgment is avoided when a plaintiff casts doubt on only one of the proffered reasons if that reason was the dominant reason.  Here, it is clear that the dominant reason offered by Defendant was Plaintiff's alleged inability to perform the position.  Plaintiff has cast doubt on this

justification.  Plaintiff has also put forth sufficient evidence of weakness, inconsistencies, and contradictions in Defendant's other stated reasons discussed herein.  The court finds that Plaintiff's evidence is sufficient to deny summary judgment on his race and color discrimination claims.[3]

Defendant's motion for summary judgment on these claims is denied.

### B.  Retaliation

Plaintiff also brings claims of retaliation under both § 1981 and Title VII and contends that he was terminated after making a complaint regarding Bolles' race-based statement to Plaintiff. Plaintiff must establish this claim under the burden-shifting framework in *McDonnell Douglas*. Under that framework, Plaintiff must first show 1) that he engaged in protected opposition to discrimination, 2) "that a reasonable employee would have found the challenged action materially adverse," and 3) "that a causal connection exists between the protected activity and the materially adverse action."  *Hansen v. SkyWest Airlines*, 844 F.3d 914, 925 (10th Cir. 2016) (quoting *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 803 (10th Cir. 2007)).  After establishing his prima facie case, the burden shifts to Defendant "to come forward with a legitimate, non-retaliatory rationale for the adverse employment action.  If the defendant does so, the plaintiff must show that the defendant's proffered rationale is pretextual."  *Id.* (quoting *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015)).

Here, the parties agree that Plaintiff has established a prima facie case.  Defendant has again offered the same reasons for termination.  The court finds that Plaintiff has established pretext for the reasons already addressed.  Moreover, the transcript of the termination meeting lends additional support for this claim.  In the meeting, Groce discussed Plaintiff's complaint

---

[3] Although Defendant has set forth evidence of Plaintiff's difficulties in completing paperwork, Defendant does not raise this as one of its legitimate, nondiscriminatory reason for termination.  (Doc. 39 at 22–24.)  Even if Defendant relies on this basis, the court finds that Plaintiff has put forth sufficient evidence to discredit the other reasons offered by Defendant such that a jury could find this reason was not credible.  *Bryant*, 432 F.3d at 1126–27.

regarding Bolles' race-based statement immediately prior to informing Plaintiff that he was not a good fit.  Given that Groce failed to offer any other stated justification for termination and the additional evidence discussed *supra*, Plaintiff has introduced sufficient evidence from which a jury could find that he was terminated in retaliation for protected activity.

Defendant's motion for summary judgment on this claim is denied.

## C.  ADA Discrimination

Plaintiff asserts that Defendant discriminated against him in violation of the ADA when it failed to rehire him.  Plaintiff contends that Defendant regarded his "dyslexia as a disability when [Defendant] required him to take and pass an undefined literacy test before he could be reinstated,"[4] and that Defendant believed that Plaintiff's actual nonlimiting impairment substantially limited his major life activity of working and reading such that he could not work. (Doc. 34 at 22.)

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   Like the previous discrimination claims, ADA discrimination based on circumstantial evidence is analyzed under the *McDonnell Douglas* burden-shifting framework.  *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 538 (10th Cir. 2014).  Plaintiff must first establish a prima facie case of disability discrimination by showing: (1) that he is disabled or perceived as disabled, as defined by the ADA, (2) that he is qualified to perform the essential functions of the job, and (3) that he was not hired "under circumstances which give rise to an inference that the termination was based on [his] disability."  *Id.* at 544.

---

[4] In his response, Plaintiff asserts that he was not seeking an accommodation under the ADA.  (Doc. 42 at 36.)

Defendant moves for summary judgment on the basis that Plaintiff cannot establish the first prong of his prima facie case.

Under the first prong, a disability under the ADA is either "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).   Plaintiff asserts that Defendant regarded him as disabled.   This requires Plaintiff to present evidence showing that Defendant subjectively believed either (1) he "has a substantially limiting impairment" that he doesn't have, or (2) he "has a substantially limiting impairment when, in fact, the impairment is not so limiting."  *Equal Emp. Opportunity Comm'n v. BNSF Ry. Co.*, 853 F.3d 1150, 1155–56 (10th Cir. 2017) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)).  The second test is applicable here and also requires the court to ask whether the "employer mistakenly believed that the plaintiff was substantially limited in performing a major life activity." *Id.*  Under the regulations, mental impairments include specific learning disabilities.  29 C.F.R. § 1630.2(h).  Major life activities include, but are not limited to: "(i) Caring for oneself..., learning, reading, concentrating, thinking, communicating, interacting with others, and working..."   § 1630.2(i).

Defendant moves for summary judgment on the basis that Plaintiff has not produced evidence that it believed that his dyslexia substantially limited his ability to read or work. Defendant argues that the facts show that Plaintiff was informed upon hiring that having dyslexia would not prevent him from working and that Wallace told Plaintiff that she also has dyslexia. (Doc. 39 at 36.)  In response, Plaintiff argues that Defendant erred in focusing its argument on his dyslexia and that instead Defendant believed that "Plaintiff had a learning disability, that is difficulty with his ability to read and write."  (Doc. 42 at 34.)  Plaintiff's claim, however, is based

on the fact that Defendant regarded him as disabled due to his dyslexia.  Plaintiff has not preserved

a claim in which he asserted that Defendant regarded him as disabled due to another, unknown

learning disability.  (*See* Doc. 34 at 22.)  Therefore, Defendant is correct in arguing that Plaintiff

must cite to evidence showing that Defendant believed his dyslexia substantially limited his ability

to read.  Plaintiff has not done so.  Plaintiff cites to evidence showing that his supervisors were

concerned about his ability to read or write.  Plaintiff, however, fails to cite to any evidence

showing that Defendant believed that Plaintiff could not read because of his dyslexia.[5]  Plaintiff's

argument on this element is conclusory.  The undisputed evidence is that Defendant was concerned

that Plaintiff could not read.[6]  Moreover, Gossman had no knowledge of Plaintiff's dyslexia at the

time Plaintiff was asked to take a literacy test and there is no evidence showing that Wallace had

knowledge of Plaintiff's disability until Plaintiff advised her about it.  Defendant's belief that

Plaintiff could be illiterate does not automatically equate with a belief that Plaintiff is illiterate

because of his dyslexia.  *See Morisky v. Broward Cnty.*, 80 F.3d 445, 448 (11th Cir. 1996) ("While

illiteracy is a serious problem, it does not always follow that someone who is illiterate is

necessarily suffering from a physical or mental impairment.").  Other than show that Defendant's

employees were concerned about his ability to read, Plaintiff has failed to introduce evidence that

Defendant believed that Plaintiff's dyslexia substantially limited the major life activity of reading.

Therefore, Plaintiff has failed to establish that he was regarded as disabled under the ADA

and Defendant is entitled to summary judgment on this claim.

## IV.    Conclusion

---

[5] Even if the court considered his new claim that Defendant regarded him as disabled due to some other learning disability, Plaintiff has failed to introduce any evidence that would support this claim.

[6] Although Plaintiff's claim presented in the pretrial order stated that Defendant believed that his dyslexia prevented him from the major life activity of working, Plaintiff has not raised this in his response brief.  He only discussed the major life activity of reading.  (Doc. 42 at 34–35.)  Therefore, the court will not address this major life activity.  Further, although he asserts that writing is a major life activity, writing is not contained in the regulation, he failed to preserve this in the pretrial order, and Plaintiff fails to cite any authority showing that this is a major life activity.

Defendant's motion for summary judgment is GRANTED as to Plaintiff's ADA claim.  In all other respects, Defendant's motion is DENIED.

IT IS SO ORDERED.  Dated this 20th day of April, 2023.

__s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE
